In the Supreme Court of Georgia

Decided: July 8, 2016

S16A0515. FISHER v. THE STATE.

NAHMIAS, Justice.

Appellant Ronald L. Fisher was found guilty of malice murder and other crimes in connection with the shooting death of Derrick Cullins. At Appellant's trial, the bulk of the evidence against him – including the only testimony directly identifying him as the shooter – came from David Lewis, who claimed that he was not involved in the crimes even though he admitted that he drove Appellant and the victim to the crime scene, was present during the shooting, and drove Appellant away afterwards.

Appellant's trial counsel spoke before trial with Jonathan Clark, who said he would testify that Lewis was a drug dealer and was looking for the victim to collect on a debt and flashing a revolver – the type of gun used to kill the victim – two or three days before the shooting. Trial counsel intended to call Clark to testify on Appellant's behalf but failed to subpoena or notify Clark, who then

did not show up. Trial counsel also agreed to a jury instruction that the testimony of a single witness is generally sufficient to establish a fact, without requesting an instruction on the exception that if the witness is an accomplice, his testimony must be properly corroborated. We conclude that if Appellant's counsel had not represented him deficiently in those two ways, there is a reasonable probability that the outcome of his trial would have been more favorable to him.

Accordingly, Appellant has shown that he received constitutionally ineffective assistance of counsel, and we therefore reverse his convictions.[1] However, because the evidence at trial was legally sufficient to support the guilty verdicts, the State may retry him if it chooses.

---

[1] The victim was killed on May 26, 2009. On June 22, 2010, a Fulton County grand jury indicted Appellant for malice murder, felony murder, aggravated assault with a deadly weapon, and possession of a firearm during the commission of a crime. At a trial from July 19-21, 2011, the jury found Appellant guilty of all charges. On August 24, 2011, the trial court sentenced Appellant to serve life in prison for malice murder and a consecutive term of five years for the firearm possession charge; the felony murder verdict was vacated by operation of law, and the aggravated assault verdict merged. On August 25, 2011, Appellant filed a motion for new trial in which trial counsel asserted his own ineffectiveness; Appellant was then appointed new counsel, who amended the motion on May 15, 2013. The trial court held an evidentiary hearing on August 2, 2013, and summarily denied the motion on October 23, 2014. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the January 2016 term and submitted for decision on the briefs.

We note that after this case was tried, Appellant was indicted, tried, and convicted for a murder that occurred in 2005. His appeal in that case is pending in this Court. See Case No. S16A0852.

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. In May 2009, Laura Terrell lived with her husband and two children in a townhouse complex called the Park at Lakewood in southwest Atlanta. Shortly after 4:00 a.m. on May 26, Terrell was awakened by banging on her front door. She looked out the window of her second-floor bedroom and saw the victim, dressed in a white tank top, standing at her front door. She could also hear but not see another man. Terrell asked who was there, and the victim said, "Hey, where Black at; tell him these folks out here want their money and they want their pills and they ready to take care of business; they ready to take care of business." Terrell replied, "Who is Black? I don't even know you," and the victim responded, "Hey, these folks out here; they ready to take care of business." Terrell was afraid that the men were going to kick in her door, so to stall for time, she said, "Hold on; I can't see who I'm talking to; let me go get my glasses." Instead of getting her glasses, Terrell called the police and then got down on the floor. She heard gunfire outside her townhouse as she lay on the floor waiting for help to arrive.

Sunsharin Madden lived in the townhouse next door. She was awakened by a commotion outside. When she looked out her bedroom window on the

second floor, she saw three men arguing about pills and money:  the victim, whom she described as a short, dark-skinned man with a white tank top; a tall man with a "black" complexion, dreads or braids, and a black shirt, whom she identified at trial as David Lewis; and a man who was about her height – 5'10" – and her medium complexion, with a low haircut.  Madden saw Lewis drive a car around to the back of the building, so she went into her sons' bedroom and looked out the window to see what he was doing.  She then quickly returned to her bedroom to look out front, where she saw the victim banging on Terrell's front door and heard him asking for someone named Black.  Madden heard Terrell reply, "I don't know anybody named Black," but the victim kept saying, "Please, come on, please," or words to that effect.

Meanwhile, Madden saw the man who was about her height walk to the side of the building and just stand there.  The man eventually walked over to the victim and said angrily, "I thought you said he had the money or the pills."  The victim started backing up like he was scared or nervous, and the man raised a gun and shot the victim, who fell to the ground.  The shooter turned around to leave but then came back and shot the victim twice more; as he stood over the victim, Madden heard him say something about pills.  Madden also heard the

4

shooter, who had a New Orleans accent, say something like "Roady," which she recognized as slang used by people from New Orleans. The shooter then walked to the car and got in with Lewis, who drove them away. Madden called 911 and went outside, where she found the victim lying dead face down on the ground next to her van.

Madden was speaking to the police at the scene when she noticed Lewis in the crowd fidgeting and looking upset. He was still wearing the same clothes, and Madden pointed him out. The police spoke with Lewis, who was with the victim's brother. Lewis at first told the police that he was homeless and had simply happened upon the scene, but he soon admitted that he saw the shooting and that he drove the shooter and the victim there and left with the shooter afterwards.

The police took Lewis to the station, where a detective interviewed him later that morning. Lewis was emotional and demonstrative about what he had seen and been through; he explained that he initially lied to the police at the scene because the events of that night made him afraid for his safety. Lewis said that he did not know the shooter's real name but described him as a man of average height with a medium-brown complexion and a low haircut who spoke

with a Cajun or New Orleans-type accent and went by the nickname "Noonie." Lewis was allowed to leave. The next day, the detective showed Lewis a photograph of Appellant, and Lewis said that the man in the photo was the person that he saw shoot the victim. A warrant was issued for Appellant's arrest the following day.

The murder weapon was never found, but ballistics indicated that the victim was shot with a revolver. The medical examiner determined that the victim died from a gunshot wound to the chest complicated by gunshot wounds to the face and back. Despite speaking with family and friends of Appellant in the area where the shooting took place, the police were unable to locate him. About ten months after the shooting, Appellant was arrested in Detroit, Michigan, and he was returned to Georgia for trial.

At trial, Lewis, who was not charged in connection with the shooting, testified as follows. He had known Appellant for a year-and-a-half, and the victim was his close friend. On the night of the shooting, Lewis went to the apartment complex where Appellant and the victim both lived to hang out with the victim and snort cocaine; Lewis said he often used drugs with the victim. Around 12:30 or 1:00 a.m., Lewis, the victim, and Appellant were all in the

6

parking lot talking to different people.  The victim went over to Appellant, who gave the victim some pills to sell on consignment.  Appellant then walked over and asked Lewis to drive him to a nearby store to get a six-pack of beer.  Lewis drove Appellant to the store, where they ran into the victim.  Appellant and the victim were talking when Lewis came out of the store, and Lewis heard the victim tell Appellant, "I'm going to have your money in a minute; I got to go get it."  Lewis got into the car with Appellant, who said, "He's taking too long with my money."  Lewis then drove Appellant back to the apartment complex, where they hung out in the parking lot drinking beer for the next hour-and-a-half or so.

After they finished drinking the six-pack, Appellant asked Lewis to drive him to another store that was close to the Park at Lakewood townhouses.  On the way there, they saw the victim, and Lewis pulled to the side of the road so Appellant could talk to him.  Appellant said, "Where's my money?" and the victim said, "It's at the Park at Lakewood . . . ; can I get in?"  The victim got into the backseat, and Lewis drove to the Park at Lakewood and parked in front of the unit indicated by the victim.  The three men got out of the car and stood there talking for a couple minutes.  The victim and Appellant then went up to the front door and started knocking, and Lewis got back into the car.  A woman

opened a window and said she did not know the victim or the person that he said he was looking for, but Appellant and the victim kept banging on the door, with the victim saying, "I just want the money; I want my money," and the woman responding, "I don't know you."

Appellant then demanded that the victim give him the money he owed or give back the pills. The victim took some pills out of his hat and handed them to Appellant. Appellant put the pills in his pocket and then pulled out a revolver and shot the victim in the chest. After the victim fell, Appellant stood over him, shot him in the face, and said, "That's for stealing." Appellant then walked back to the car, got in with Lewis, told him to drive, and said, "That's how we do in Louisiana."

Lewis drove toward the apartment of Ferlando Walker (who did not testify at trial). On the way there, they passed a police car, and Lewis thought about running into it so that he could get out of the car and get away. He decided not to, though, because Appellant still had the revolver in his hand, and Lewis figured that Appellant would probably shoot him before he could even get out of the car. When they arrived at Walker's apartment, Appellant and Lewis went inside. Appellant spoke with Walker, and Lewis heard Appellant say, "I just

8

shot him."

Lewis then drove Appellant back to the apartment complex where they started out. Lewis walked around the corner to the home of a friend who could help him find the victim's mother's apartment so Lewis could tell her what had happened to her son. Lewis found the victim's family and told them that the victim had just been shot and that Lewis saw the shooting; he did not tell them that he was driving the car. Lewis then returned to the scene of the shooting with the victim's brother, where the police approached him.

Appellant testified in his own defense. He said that he was from New Orleans and had lived in Atlanta for only three years, and he denied knowing the victim or having any association with him. At first, Appellant also denied knowing Lewis, but then he acknowledged that he had once "exchanged words" with Lewis when Appellant was trying to date Lewis's sister. When asked if he had ever seen Lewis before, Appellant replied, "Well, maybe when I walked to the store." Appellant denied that he had ever had a beer with Lewis, described Lewis as a "crack head," and claimed that he did not associate with Lewis's family and friends. Appellant flatly denied Lewis's account and testified that on the date of the shooting, he did not shoot anybody or tell or encourage

9

anyone to shoot anybody. Appellant claimed that he had never been to the townhouse complex where the shooting occurred and asserted that the only reason he was on trial was because Lewis accused him of something that he did not do.

On cross-examination, Appellant admitted that he has a New Orleans accent; that he is about 5'9", has a medium complexion, and always had a low haircut; and that he knew the location of the townhouse complex where the victim was shot. Appellant also acknowledged that he was friends with Ferlando Walker and had been to Walker's apartment. Appellant denied knowing that there was a warrant out for his arrest, claiming that he was not in contact with his family or friends in 2009. When pressed about whether he cut off all contact with his family in the area, Appellant replied, "I would talk to them, but I had no idea what was going on." He offered no explanation for his move to Detroit.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial

10

and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also <u>Vega v. State</u>, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2.      Appellant contends that he received ineffective assistance of counsel based on the performance of his trial attorney, Ted Johnson. A claim of ineffective assistance of counsel based on the quality of the representation requires a showing of both deficient performance and resulting prejudice. See <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, the defendant must demonstrate that his counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. To show resulting prejudice, a defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

11

A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The combined effect of counsel's unprofessional errors must be considered in assessing whether the requisite prejudice has been shown. See Schofield v. Holsey, 281 Ga. 809, 811 n.1 (642 SE2d 56) (2007) ("The Supreme Court of the United States has held that it is the prejudice arising from 'counsel's errors' that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum." (citing Strickland, 466 U.S. at 687)).

(a)    Appellant identifies two omissions by Johnson that he contends were not the result of reasonable professional judgment. He points first to Johnson's failure to secure the attendance of Jonathan Clark to testify for the defense at trial. At the motion for new trial hearing, the State did not object to the admission of Clark's affidavit or dispute its contents.[2] According to

---

[2] The District Attorney notes in his brief that this Court has in the past approved the use of affidavits to establish a claim of ineffective assistance of trial counsel at an evidentiary hearing on a motion for new trial, citing Dickens v. State, 280 Ga. 320, 322 (627 SE2d 587) (2006), as well as Benjamin v. State, 322 Ga. App. 8, 11 (743 SE2d 566) (2013) (citing Dickens). However, Dickens and Benjamin were decided under Georgia's old Evidence Code and relied on former OCGA § 24-10-40 – a provision that was not carried forward in the new Evidence Code – and the evidentiary hearing on Appellant's motion for new trial took place after the effective date of the new Code. See Ga. L. 2011, p. 99, § 101 ("This Act shall become effective on January 1, 2013, and shall apply to any motion made or hearing or trial commenced on or after such date."). It is unclear whether the holding of Dickens based on former § 24-10-40 survived the enactment of the new Evidence Code.

Clark's affidavit, he knew Lewis because Lewis was his drug dealer; he also knew the victim and Appellant, but he never saw Lewis and Appellant together; he spoke to Johnson by telephone before the trial and knew that Johnson was Appellant's attorney; he told Johnson that he saw Lewis flashing a revolver while looking for the victim to collect on a debt two or three days before the shooting; he gave Johnson his contact information but never again heard from Johnson; and he was available and willing to testify at Appellant's trial but was not aware that the trial had been scheduled until it was over.

Johnson put Clark on the defense's witness list and testified at the motion for new trial hearing that he fully intended to call Clark to testify at trial, both to attack Lewis's credibility directly (as on cross-examination, Lewis vigorously denied the encounter with Clark recounted in Clark's affidavit) and to establish that Lewis was at least an accomplice to the shooting. Johnson's only explanation for his failure to subpoena Clark was that "since Mr. Clark was associated with [Appellant], I attempted to have him just to show up on his own free will," although Clark's affidavit indicates that he was never even notified

_____

We have no occasion to decide that question in this case, however, because the State did not object to the admission of Clark's affidavit at the hearing on this ground or any other, and the State does not argue on appeal that the trial court erred in admitting Clark's affidavit as substantive evidence.

13

of the trial date.

The State does not dispute that Johnson was professionally deficient in failing to secure Clark's attendance at trial.[3] Unlike many cases involving this issue, there is no indication that Johnson had concerns about Clark's potential testimony or credibility that might have provided a reason not to call him to testify despite listing him on the defense's witness list. See, e.g., Bryant v. State, 298 Ga. 703, 708 (784 SE2d 412) (2016) ("It was not unreasonable for trial counsel to make a strategic decision declining to put forward an uncooperative alibi witness or an alibi witness who would have provided conflicting testimony."); Fortson v. State, 280 Ga. 435, 437 (629 SE2d 798) (2006) (concluding that the defendant did not show deficient performance where his trial counsel did not call an alleged alibi witness due to concerns about her credibility).

To the contrary, Johnson apparently thought that Clark would just show up and wanted him to testify, but did not subpoena him to ensure that Clark would appear or that Appellant would be able to have the trial continued if Clark

[3] In their briefs to this Court, the Attorney General ignores the question of deficient performance with respect to Clark, while the District Attorney pretermits this question and focuses instead on Appellant's alleged failure to show resulting prejudice.

14

did not appear. See OCGA § 17-8-25 ("In all applications for continuances upon the ground of the absence of a witness, it shall be shown to the court that the witness . . . has been subpoenaed . . . ."). Accordingly, we conclude that Appellant has shown that Johnson was professionally deficient in failing to subpoena Clark or otherwise secure his attendance at trial.

Appellant also points to Johnson's failure to request that the trial court instruct the jury on former OCGA § 24-4-8, which was in effect at the time of Appellant's trial and said that in felony cases the testimony of a single witness whom the jury finds to be an accomplice is *not* sufficient to prove a fact.[4] Johnson testified at the motion for new trial hearing that his failure to request such an instruction was a simple "oversight," adding, "It certainly was not trial strategy; [it was] something that I overlooked to request of the court."

---

[4] Former OCGA § 24-4-8 said:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

This provision was carried forward in the new Evidence Code as OCGA § 24-14-8, and we give the new provision the same meaning as the old one. See Bradshaw v. State, 296 Ga. 650, 654 (769 SE2d 892) (2015).

15

The State does not contend that Johnson's failure to request an accomplice corroboration instruction was an exercise of reasonable professional judgment. Lewis's admission of his involvement with Appellant in the events before, during, and after the shooting, along with his initial lies to the police at the crime scene, could support a finding that Lewis was an accomplice and not merely present for the crimes as he claimed on the witness stand. See Hicks v. State, 287 Ga. 260, 262 (695 SE2d 195) (2010) ("To authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge."); Babbage v. State, 296 Ga. 364, 367 (768 SE2d 461) (2015) ("[E]vidence regarding defendant's presence at crime scene, motive, and conduct before and after crime was sufficient to establish guilt as an accomplice."). See also Hamm v. State, 294 Ga. 791, 794 (756 SE2d 507) (2014). And the defense theory was that Lewis was trying to shift blame from himself and should not be believed regarding Appellant's involvement in the crimes.

Given the importance of Lewis's testimony to the State's ability to prove its case against Appellant, it would have been entirely unreasonable for Johnson to make a "strategic decision" to approve the trial court's instruction to the jury

16

that "generally, the testimony of a single witness, if believed, is sufficient to establish a fact," without insisting that the court also instruct the jury that this general rule did *not* apply to Lewis's testimony if the jury found him to be an accomplice. See Stanbury v. State, Case No. S16A0321, 2016 WL 2946426, at *3-5 (May 23, 2016) (holding that the trial court committed plain error in a case involving accomplice testimony by failing to charge the jury on former OCGA § 24-4-8's corroboration requirement, where the court instructed the jury that testimony by a single witness can prove a fact). See also Reed v. State, 294 Ga. 877, 882 (757 SE2d 84) (2014) ("[D]ecisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course."). Thus, we agree with Appellant that Johnson's failure to request an accomplice corroboration instruction also constituted deficient performance under Strickland.

(b)    Whether sufficient prejudice resulted from trial counsel's two deficiencies is a closer and more disputed question. As mentioned previously, Appellant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

17

different," which means "a probability sufficient to undermine confidence in the outcome" of his trial. Strickland, 466 U.S. at 694. In determining whether Appellant has satisfied this prejudice standard, we must consider the effect of his counsel's two errors not in insolation but in combination, see Schofield, 281 Ga. at 811 n.1, reviewing the record de novo and weighing the evidence as reasonable jurors would have done, see Woodard v. State, 296 Ga. 803, 810 n.5 (771 SE2d 362) (2015). Applying these principles, we conclude that Appellant has shown the prejudice needed to prevail on his ineffective assistance claim.

We start with the recognition that the lynchpin of the State's case against Appellant was the credibility of David Lewis. There was no forensic evidence linking Appellant to the victim, the crime scene, or the murder weapon. Neither of the two women from the townhouse complex testified that Appellant was there during the shooting. Terrell saw only one man, the victim, although she heard a second man and the victim referred to "the[m]," indicating the presence of someone else. Madden saw the victim, Lewis, and the third man she said was the shooter, for whom she offered only a general description – about 5'10", medium complexion, with a low haircut and a New Orleans accent. This description matched Appellant, but it would match innumerable other men in

18

Atlanta as well, except perhaps for the accent (and we note in this respect that Lewis admitted on cross-examination that although he is from Atlanta, he is known in the community as "N.O.," or New Orleans, because of his voice). There was also Appellant's admission that he was acquainted with Lewis, although he flatly denied any closer association, and Appellant's unexplained move to Detroit around the time of the shooting. Put together, this circumstantial evidence might well constitute the "slight" evidence necessary to corroborate an accomplice's testimony and allow a conviction under former § 24-4-8, see Cowart v. State, 294 Ga. 333, 344 (751 SE2d 399) (2013), but it would not have been sufficient to prove Appellant's guilt beyond a reasonable doubt.

That depended on the jurors believing what Lewis told them. His testimony presented him as a pitiable drug user who got caught up in events beyond his control with a dangerous and violent drug dealer – Appellant – who unexpectedly killed his good friend and then made him drive Appellant around in fear of being shot, after which he compassionately notified the victim's family and cooperated with the police despite some initial hesitation.

Clark's affidavit paints a very different picture of Lewis, his relationship

19

with the victim, and his potential role in the fatal shooting. According to Clark, Lewis was himself a drug dealer, and Lewis was looking for the victim and flashing a revolver – the type of gun used to kill the victim – just days before the shooting. As Lewis admitted and Madden confirmed, Lewis drove both the victim and the shooter to the crime scene, was present during the shooting, and then drove the shooter away. So as Johnson recognized, Clark's testimony would have provided critical support for the defense theory that Lewis was at least an accomplice if not the shooter himself, and that he falsely implicated Appellant in a successful attempt to deflect blame and portray himself as another of Appellant's victims.

The State points out that Clark did not witness the murder, that Johnson vigorously cross-examined Lewis, and that there was some evidence corroborating Lewis's testimony. Clark did not purport to be able to identify the shooter, but his testimony would have impeached the State's only witness who claimed to identify the shooter. Johnson did attempt to cross-examine Lewis using the information he had obtained from talking to Clark before the trial. But when Johnson asked Lewis if he had told Clark that he was looking for the victim before the shooting because the victim owed him money, Lewis flatly

denied it. Johnson then was stuck with the denial, because Clark was not there to testify to the contrary. Likewise, without Clark, Johnson had no way to present substantive evidence that Lewis was flashing a revolver – the type of gun used in the murder and a type of gun not linked to Appellant except by Lewis's testimony.

As for the evidence corroborating Lewis's identification of Appellant as the shooter, the State confuses the slight amount of evidence needed for the jury to find sufficient corroboration in order to rely on an accomplice's testimony with the amount of evidence needed to independently prove the defendant guilty beyond a reasonable doubt so that the failure to give the jury a proper accomplice corroboration instruction could cause no prejudice. See, e.g., Hayes v. State, 281 Ga. App. 749, 751 (637 SE2d 128) (2006) (holding that trial counsel's alleged deficiency in not requesting an accomplice corroboration instruction resulted in no prejudice where the State "adduced ample evidence wholly sufficient to warrant the verdict (independent of the accomplice's testimony)," including "the testimony of the victim of his armed robbery, . . . two eyewitnesses who were nearby, [and] a police officer who intercepted the vehicle in which [the defendant] was attempting to escape"). As already

discussed, the evidence aside from Lewis's testimony falls short of that higher standard.

Even without Clark's testimony, Johnson should have requested an accomplice corroboration instruction advising the jury of the requirements of former OCGA § 24-4-8. As discussed earlier, there was enough evidence to demand such a charge, which would have told the jurors that Lewis was potentially not like the other witnesses they heard, on whom the trial court instructed them they were entitled to base their entire verdict; instead, they would need to determine if Lewis was actually an accomplice and then determine if they could believe what he said not only in the way they evaluated the other witnesses but because the State had presented other evidence corroborating his identification of Appellant as a participant in the shooting. Adding Clark's testimony to the mix would have significantly bolstered the basis for the jury instruction, the likelihood that the jurors would find Lewis to be an accomplice, and the likelihood that they would disbelieve what Lewis told them.

The parties' closing arguments only magnified the effect of Johnson's deficiencies. Johnson focused on Lewis's lack of credibility and the State's

failure to present evidence corroborating his identification of Appellant as the shooter – but without an accomplice corroboration instruction from the court to support his contentions legally, and without Clark's testimony to support them factually. The State told the jury directly that Lewis's testimony alone was enough to prove Appellant's guilt, because "testimony of a single witness alone can prove a fact." The State also asserted that the testimony of the medical examiner, the firearms expert, and the two witnesses from the townhouse complex corroborated various aspects of Lewis's testimony other than his identification of Appellant as the shooter – which is an appropriate way to corroborate most witnesses, but insufficient to corroborate an accomplice. See Crawford v. State, 294 Ga. 898, 901 (757 SE2d 102) (2014) ("[A]ccomplice corroboration of only the chronology and details of the crimes is not sufficient[;] . . . there must be some independent evidence tending to show that the defendant himself was a participant in the crimes.").

There is nothing incredible in Clark's affidavit, the State has not disputed what it says, and the trial court indicated no concern about accepting it as true. Nevertheless, had Clark testified, the jury could have chosen not to believe what he said about Lewis. But that is exactly the point. Due to the deficient

performance of Appellant's trial counsel, the jurors who found him guilty did not have the opportunity to hear Clark testify or to consider the evidence they did hear with the instruction that if they found Lewis to be an accomplice to the shooting, they must treat him unlike the other witnesses and decide whether his identification of Appellant was corroborated by other evidence. A jury that heard Clark and was properly instructed might reach the same verdict, but we cannot say that with confidence. See Stanbury, 2016 WL 2946426, at *4 ("A trial court's failure to give an accomplice corroboration instruction when a defendant is affirmatively identified as the . . . gunman in a murder based solely on accomplice testimony undermines the fairness of the proceedings, at least when coupled with the express authorization by the court for the jury to establish critical facts based solely on this testimony.").

Accordingly, we conclude that Appellant has carried his burden to show that his trial counsel's deficient performance resulted in prejudice as defined in Strickland. His convictions must therefore be reversed, although the State may choose to retry him. See Cowart, 294 Ga. at 343-344.

Judgment reversed. All the Justices concur.