305 Ga. 371
FINAL COPY

S18A1396.  CARTWRIGHT v. CALDWELL.

NAHMIAS, Presiding Justice.

During his 2007 trial, Derrick Cartwright asserted an alibi defense to charges of murder and other crimes in connection with the shooting death of Kevin Stafford.  Cartwright was convicted and sentenced to serve life in prison plus five years.  On direct appeal, he claimed among other things that his trial counsel provided ineffective assistance by failing to challenge Detective Andrew Tyner's testimony that Cartwright had not mentioned his alibi during his post-arrest police interview.  Cartwright contended that during a preliminary hearing, Detective Bernard Spicer, the lead investigator in the case, testified that Detective Tyner told him that Cartwright *had* mentioned his alibi during the interview.  This Court affirmed Cartwright's convictions, rejecting his claim that his trial counsel provided ineffective assistance by failing to introduce Detective Spicer's testimony; we held that Cartwright had not shown prejudice because at the motion for new trial hearing, he failed to call Detective Spicer as a witness

or introduce a transcript of the detective's preliminary hearing testimony. See Cartwright v. State, 291 Ga. 498, 500 (731 SE2d 353) (2012).

Cartwright then filed a petition for habeas corpus, alleging among other things that his appellate counsel provided ineffective assistance by failing to introduce evidence to prove trial counsel's ineffectiveness in failing to impeach Detective Tyner. The habeas court denied the petition. We granted Cartwright's application to appeal to consider whether the habeas court erred in ruling that Cartwright had not shown that his appellate counsel provided ineffective assistance. We conclude that the habeas court's ruling was erroneous, and we therefore reverse the denial of habeas relief.

1. (a) The evidence presented at Cartwright's trial showed the following.[1] In the early morning hours of April 3, 2006, police officers responded to reports of a car crash at the corner of 35th Street and 6th Avenue in Columbus. At the scene, officers found a car that had crashed into some steps outside a house; in the driver's seat was Kevin Stafford, who had been shot once

---

[1] Because the ineffective assistance claim raised here requires us to examine the strength of the evidence presented at trial, this summary of the evidence includes details beyond those included in our opinion on Cartwright's direct appeal, which summarized the evidence in the light most favorable to the jury's verdicts. See Cartwright, 291 Ga. at 498-499.

in the neck. He was taken to a hospital, where he soon died from the gunshot wound.

Officers investigating the shooting found a shell casing, a bullet jacket, and a bullet fragment in Stafford's car. A ballistics examiner later determined that the bullet jacket and fragment were fired from a .380-caliber pistol and that the shell casing was consistent with being fired from a .380-caliber pistol. The police did not find a gun at the scene.

About two weeks later, an officer interviewed Diane Ruhl, who lived on 6th Avenue. She said that she had seen Derrick Cartwright shoot Stafford after Cartwright asked Stafford, "where is my $40.00, mother f\*\*ker?" Ruhl also identified Cartwright as the shooter in a photo lineup. The police then obtained a warrant for Cartwright's arrest, and he turned himself in on April 26. He was interviewed by Detective Tyner later that day. On November 28, 2006, a Muscogee County grand jury indicted Cartwright for malice murder, felony murder based on aggravated assault, aggravated assault, and possession of a firearm during the commission of a crime.

At a trial that began on April 30 and ended on May 3, 2007, the State presented testimony from four eyewitnesses who identified Cartwright in court

3

as the shooter. Ruhl and her friend Antonio Willis, who is known as "T-Mac" and who was selling cocaine near 35th Street at the time of the shooting, both testified that sometime between 3:00 a.m. and 4:30 a.m., Stafford pulled his car over on 6th Avenue, and Cartwright approached Stafford, who was sitting in the driver's seat; Cartwright told Stafford that he owed Cartwright $40, and they began to argue; Cartwright shot Stafford; and Stafford then fled in his car before crashing. Willis testified that Cartwright had been carrying a .380-caliber gun earlier that evening.[2] Willis also testified that on the day after the murder, Cartwright asked him if anyone had said that Cartwright was involved in the shooting. Willis was asked at trial if he had any involvement in the shooting, and he denied it.

In addition, Marcus Brown and his sister, who had both been at a party

---

[2] Our summary of the evidence in Cartwright noted that "[t]wo witnesses had seen Cartwright with a .380 semi-automatic pistol earlier in the evening." 291 Ga. at 499. We take that statement as an inference from the evidence "[v]iewed in the light most favorable to the verdict." Id. at 498. In response to the prosecutor's questions about the gun, Willis testified that Cartwright "had a     I think it was like a snub nose .38 or .380 or something like that. It was a gun. I know it was a gun." On cross-examination, Cartwright asked Willis, "You thought you saw Mr. Cartwright with a snub nose, like a snub nose .38?" Willis responded, "To tell you the truth, I don't remember what kind of gun it was." Cartwright asked, "You don't remember if it was a revolver or semi-automatic or anything like that?" Willis said, "I didn't get a chance to hold the gun. It's like what I got." Ruhl testified that she saw Cartwright with a gun earlier that evening, but she did not testify directly about the type of gun she saw; no other witnesses testified that Cartwright had been carrying a gun earlier that evening.

4

near 6th Avenue just before the murder, identified Cartwright as the shooter in photo lineups before trial and later testified that they saw Cartwright shoot Stafford.[3] Brown also testified that while he was in a holding cell in the courthouse with Cartwright on the second day of the trial, Cartwright had threatened him, saying that he "had better tell people [he] didn't know [Cartwright]."

Cartwright presented an alibi defense at trial. He did not testify, but he presented testimony from five witnesses — his mother, two sisters, his sister's boyfriend, and a family friend — to support his claim.[4] The defense also

---

[3] While Brown was in jail on unrelated felony charges, he sent a letter to the police the day after Cartwright was arrested saying that Cartwright had committed the murder. During Brown's police interview, he initially changed his story and said that Willis was the shooter. Later in the interview, however, he reasserted that Cartwright was the shooter. Brown explained that just before his interview, an acquaintance of Cartwright's who was also in the jail offered him money to say that Willis killed Stafford. Brown said that he had planned to accept the money, but during the course of his interview, he changed his mind and reasserted his accusation against Cartwright.

[4] Ruhl testified on direct examination that the shooting occurred around 3:00 a.m.; on cross-examination, she said that it occurred at 4:00 a.m.; and on re-direct, she said that it occurred between 3:30 a.m. and 4:30 a.m. Willis testified that the shooting occurred around 3:00 a.m. Brown testified that the shooting occurred sometime after 3:00 a.m. or 3:30 a.m. A defense witness who claimed Willis told her that he killed Stafford testified that she lived on 7th Avenue and heard gunshots at 4:17 a.m. Unhelpfully, no testimony was presented regarding when the police officers responded to the crime scene.

In support of Cartwright's alibi defense, his mother testified that she was upstairs in the apartment where her family stayed; she heard Cartwright arrive around 1:00 a.m.; and she later saw him asleep on the couch around 7:30 a.m. One of his sisters testified that he arrived at the apartment around 1:00 a.m. and went to sleep on the couch; she awoke around 4:00 a.m. and saw him still sleeping on the couch; and he was still asleep around 7:00 a.m. Cartwright's other sister said that

5

presented testimony from two other witnesses who claimed that Willis told them that he shot Stafford over a drug dispute.[5] In addition, Cartwright impeached Ruhl and Willis with evidence of their felony drug convictions, elicited Ruhl's admission that she had used cocaine just before the shooting, argued in closing that Brown and his sister were biased in favor of the State because Brown was facing felony charges at the time of trial, and pointed out inconsistencies between the witnesses' accounts of the shooting.[6]

she let Cartwright into the apartment around 1:00 a.m. or 1:30 a.m.; she then went upstairs while Cartwright stayed downstairs; around 3:00 a.m., she went downstairs to make a bottle for her daughter and saw Cartwright asleep on the couch; and she also saw him sleeping on the couch around 8:00 a.m. Her boyfriend, who was also staying in the apartment that night, testified that he was upstairs watching a movie; around 3:00 a.m., he went downstairs to get a drink and saw Cartwright asleep on the couch; and Cartwright was still asleep around 7:30 a.m. Finally, the family friend testified that she saw Cartwright arrive at the apartment around 1:00 a.m. and that he was sleeping on the couch when she awoke sometime before lunchtime. There is no evidence in the record about how far the apartment is from the crime scene or how long it would take to get there and back in the wee hours of the night.

[5] Detective Tyner testified that during Cartwright's post-arrest interview, Cartwright "simply said he didn't have anything to do with this particular murder and gave the name of an individual whom he thought . . . had committed the crime." Neither the prosecutor nor Cartwright's trial counsel asked if the name Cartwright had given was Willis's. In closing argument, however, the prosecutor asserted twice that Cartwright had said in his interview that "T-Mac did it." In addition, after Cartwright's attorney moved for a mistrial near the end of trial on the ground that the prosecutor improperly commented on Cartwright's failure to mention his alibi during his interview, both parties told the court outside the presence of the jury that Cartwright named "T-Mac" as the shooter during his interview.

[6] Ruhl testified that after Stafford stopped his car on 6th Avenue, Cartwright pulled his truck over near Stafford's car, got out, began arguing with him, and then shot him; she said that Stafford never got out of his car. Willis testified that Cartwright was not in a truck, but was standing outside a nearby house just before he approached Stafford's car on foot. Brown testified that Cartwright had driven a truck near 6th Avenue; about 15 minutes later, Stafford parked his car on 6th Avenue and

To rebut Cartwright's alibi defense, the prosecutor asked Detective Tyner multiple questions to establish that Cartwright had not mentioned his alibi during his post-arrest interview.[7] Cartwright's trial counsel did not cross-examine Detective Tyner about Cartwright's statements during the interview.[8]

went into a nearby house for about 10 to 15 minutes; he left the house and got into his car; and Cartwright approached Stafford and shot him. Brown's sister testified that she saw Stafford and Cartwright arguing on a front porch; Stafford then went to his car; and Cartwright followed and shot him.

[7] The following exchange took place:
[PROSECUTOR]: All right. Now, did [Cartwright] mention anything about an alibi?
[DETECTIVE TYNER]: No, he didn't.
[PROSECUTOR]: Did he mention anything that he was with his mother during the time of the shooting?
[DETECTIVE TYNER]: No.
[PROSECUTOR]: Did he mention anything about that he was with his sister during the time of the shooting?
[DETECTIVE TYNER]: No, he didn't.
[PROSECUTOR]: Did he mention anything about being with his sister at the time of this shooting?
[DETECTIVE TYNER]: No.
[PROSECUTOR]: Did he mention anything about being with his sister's friend at the time of the shooting?
[DETECTIVE TYNER]: No, he didn't.
[PROSECUTOR]: During the time when he was being questioned did he mention or even hint at the fact of having an alibi or being with someone else during the time of the shooting?
[DETECTIVE TYNER]: No, sir. He didn't say anything about an alibi.
[PROSECUTOR]: If he would have given you the names of [his alibi witnesses], would you have made a report to that fact?
[DETECTIVE TYNER]: It would have been in the report, yes.

[8] Cartwright's trial counsel did ask Detective Tyner whether there was a report detailing the interview. Detective Tyner replied that Detective Bernard Spicer, the lead investigator on the case, wrote a report. (It is not clear why Detective Spicer would have written the report on an interview for which he was not present.) Detective Spicer also referred to a report on the interview in his preliminary hearing testimony. The report, however, was not introduced into evidence during the

During closing arguments, the prosecutor repeatedly asserted that Cartwright never mentioned his alibi to Detective Tyner; said that Detective Tyner's testimony in that respect was "undisputed evidence"; and argued over and over again that Cartwright must have invented his alibi after his interview and then asked his mother and sister to testify to the alibi at his preliminary hearing a week later.[9]

---

trial. At the motion for new trial hearing, the appellate attorneys for the State and Cartwright told the trial court that they had not been able to locate a copy of it and believed it had been lost, and the report was not admitted during the habeas hearing.

[9] Near the beginning of the State's rebuttal argument, the prosecutor said, "One, the defendant never mentioned anything to Detective Tyner about an alibi. Here I am charged with a murder, knew there was a warrant for me. Family, as they testified, knew a murder had took place around this same time. And I don't mention that I was somewhere else when this murder occurred." Later, the prosecutor said:

> The defendant, his statement to Detective Tyner. He never said anything about having an alibi. Now, we see a lot of people charged with different things, escape, sell drugs, what have you. Now, you mean to tell me that I'm being charged with a murder, murder now, and I don't even say    all I said, well, I didn't do it. T-Mac did it. But you don't add that little part about I was at . . . my sister's house with my mother, her baby's daddy, my little sister and her friend. Hum, that's a little bit different from when they go to Recorder's Court [for the preliminary hearing]. What do you think happened between the time he was arrested and the time that he went to Recorder's Court seven days later? He's like, hey, mom, I'm being charged with murder, I need y'all to tell the police that I was with you all. You turn to your family first. And as a mother would do to protect her child, she comes in and says that. That's reasonable because think about it, ask yourself, you mean to tell me I know, I know that I wasn't even near 6th Avenue and I was with my mother, I was with my mama when this happened. Oh, I was with my mama. Get them down here right now. You are not going to add that extra sentence. He knows he's several blocks away. You are not even going to say, man, I didn't do that. I was asleep. Ask my mama, ask my sister, ask . . . my other sister, ask her best friend . . . and my sister's baby's daddy. You mean he's not going to tell Detective Tyner that? All he says is, man, I didn't do it. I heard T-Mac did it though. I'm not going to tell him I was

The jury found Cartwright not guilty of malice murder but guilty of felony murder, aggravated assault, and possession of a firearm during the commission of a crime.[10] He was sentenced to serve life in prison for felony murder and five consecutive years for the firearm offense; the aggravated assault count merged.

(b)    Cartwright filed a motion for new trial, which he amended twice with new counsel, claiming among other things that his trial counsel provided ineffective assistance by failing to impeach Detective Tyner's testimony that Cartwright had not mentioned his alibi during his post-arrest interview. Cartwright asserted that at his May 2006 preliminary hearing, Detective Bernard

---

nowhere near the scene.
> So roll all that together. Okay. Well, hey, in seven days, I can get my mom and my sister to come in.  All right.  Now, come in months later, almost a year later, maybe I can bring some more people in to help me out on the case as well.  Think about that.  Once again, is it reasonable if you know, if you know for sure you have an airtight, lock and seal alibi, you are not going to tell the detective to keep from being arrested or get out?  Well, look, bring my mother down here.  He's not going to mention that?

A few moments later, the prosecutor returned to the point:
> Once again, . . . you say you got an airtight alibi.  Why not tell Detective Tyner about alibi . . . .  Because that's why, there was no alibi . . . .  He didn't tell Detective Tyner that.  All he said, he gave a little short statement.  He had a little time to make it up.  As I mentioned, reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth.  Undisputed evidence, the defendant never mentioned anything about an alibi or how he got back from 6th Avenue.

[10] As discussed in detail in Cartwright, during the trial court's poll of the jury, one juror told the court that she did not reach her verdict freely and voluntarily, and the court then told the jury to continue to deliberate.  See 291 Ga. at 500-501.  After further deliberations, the jury arrived at the same verdict it had initially reached.  See id.

9

Spicer, the lead investigator in the case, testified that Detective Tyner told him that Cartwright said in his interview that he was at home with his mother and sister at the time of the murder. After an evidentiary hearing, the trial court denied Cartwright's motion for new trial in November 2011.

Cartwright then filed an appeal raising the same ineffectiveness claim, among other things.[11] In September 2012, this Court affirmed Cartwright's convictions. See Cartwright, 291 Ga. at 501. As to his claim that his trial counsel provided ineffective assistance by failing to impeach Detective Tyner's testimony, we noted that a defendant who bases an ineffective assistance claim on counsel's decision not to call a particular witness may not rely on hearsay or speculation regarding what the witness would have testified to. See id. at 500. We then said:

> Cartwright did not call Detective Spicer to testify at the motion for new trial hearing, nor did he introduce a transcript of the detective's testimony from the preliminary hearing. As such, Cartwright has failed to establish a reasonable probability that the outcome of the trial would have been different if Detective Spicer's

[11] Cartwright also argued on appeal that he received ineffective assistance because his trial counsel erroneously informed him that he could be impeached with his juvenile record if he testified and because counsel did not move the court to ask the juror discussed in footnote 10 above whether her second verdict was freely and voluntarily entered; we rejected those claims as meritless. See Cartwright, 291 Ga. at 499-501.

testimony had been introduced to impeach that of Detective Tyner. Therefore, the second prong of the Strickland test is not met.

Id. (referring to Strickland v. Washington, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)).

(c)     In September 2016, Cartwright, through new counsel, filed a petition for habeas corpus raising two claims, only one of which is raised in this appeal: that his appellate counsel provided ineffective assistance by failing to introduce evidence at the motion for new trial hearing to prove trial counsel's ineffectiveness in failing to impeach Detective Tyner's testimony that Cartwright had not mentioned his alibi during his post-arrest interview. At an evidentiary hearing in January 2017, Cartwright introduced into evidence, without objection, the transcript of his preliminary hearing. The transcript shows that Cartwright's pre-trial attorney asked Detective Spicer: "[D]o you know if . . . within [Cartwright's post-arrest interview, Cartwright] told Detective Tyner that . . . at the time of this alleged murder . . . he was at home with his mama and sister?" Detective Spicer answered, "Yes, sir. Detective Tyner did relate that to me."

At the habeas hearing, Cartwright also introduced into evidence, without

11

objection, an affidavit from Detective Spicer stating that "Detective Tyner did relate to me that Cartwright stated [in the interview] that at the time of the murder, he was at home with his mother and sister." Detective Spicer also said that Cartwright's trial and appellate attorneys never interviewed him about the case or called him as a witness. See OCGA § 9-14-48 (a) (stating that a habeas court "may receive proof by . . . sworn affidavits"). Cartwright did not call his trial counsel to testify at the habeas hearing, and his appellate counsel was deceased by then.

The habeas court denied Cartwright relief. The court pretermitted the question of deficient performance and concluded that Cartwright had not established prejudice on this ineffective assistance claim because he had presented his alibi defense at trial through the testimony of several other witnesses, but the jury had chosen to reject that defense and to credit the testimony of the State's witnesses instead.

Cartwright filed a timely notice of appeal and a timely application for a certificate of probable cause to appeal. We granted his application to address whether Cartwright's appellate counsel provided ineffective assistance by failing to introduce evidence to support Cartwright's claim that his trial counsel

12

was ineffective for failing to impeach Detective Tyner. Because appellate counsel was ineffective, we will reverse the habeas court's judgment.

2. To prevail on a claim of ineffective assistance of appellate counsel, a habeas petitioner must show that his appellate counsel performed deficiently and that the deficiency prejudiced his appeal. See Taylor v. Metoyer, 299 Ga. 345, 348 (788 SE2d 376) (2016). See also Strickland, 466 U.S. at 687. To prove deficient performance, the petitioner must show that appellate counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See Strickland, 466 U.S. at 687-690. To overcome the strong presumption that counsel performed reasonably, the petitioner must show that "'no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not.'" Brown v. State, 302 Ga. 454, 457 (807 SE2d 369) (2017) (citation omitted). See also Taylor, 299 Ga. at 348.

To demonstrate prejudice, the habeas petitioner must show that there is a reasonable probability that, but for appellate counsel's unprofessional errors, the result of the appeal would have been different. See Taylor, 299 Ga. at 348. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." Strickland, 466 U.S. at 694. To determine prejudice involving a claim that appellate counsel provided ineffective assistance by failing to properly raise or prove a claim of ineffective assistance of trial counsel, the petitioner must demonstrate that the underlying ineffectiveness-of-trial-counsel claim would have had a reasonable probability of success. See Gramiak v. Beasley, 304 Ga. 512, 513 (820 SE2d 50) (2018). Accordingly, under these circumstances, the petitioner must show that his trial counsel performed deficiently, and that, but for trial counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. See id.

(a) Turning first to the issue of trial counsel's ineffectiveness, we begin by addressing whether trial counsel performed deficiently by failing to present evidence at trial tracking Detective Spicer's preliminary hearing testimony and habeas hearing affidavit — a question that the habeas court pretermitted. At trial, a major focus of Detective Tyner's testimony was Cartwright's purported failure to mention his alibi during his post-arrest interview. Evidence that Detective Tyner told Detective Spicer that Cartwright *did* assert his alibi in the interview would have directly contradicted Detective Tyner's testimony — with

14

that evidence coming from a fellow police officer and the lead investigator for Cartwright's case.

Moreover, the evidence from Detective Spicer would have been admissible not only for the limited purpose of impeaching Detective Tyner, see former OCGA § 24-9-83 ("A witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case."), but also as substantive evidence that Cartwright provided his alibi during the interview, see Holiday v. State, 272 Ga. 779, 780 (534 SE2d 411) (2000) (explaining that "a prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible both to impeach the witness and as substantive evidence").[12]  In addition, if this evidence contradicting Detective Tyner had been introduced, the prosecutor would have had to omit or at least substantially soften his emphasis in closing argument on Cartwright's supposed post-interview invention of his alibi.

Cartwright's trial counsel, however, did not even cross-examine Detective Tyner about Cartwright's alleged failure to mention his alibi, much less present

---

[12]  Cartwright was tried in 2007 under Georgia's old Evidence Code.  Under the new Evidence Code, the rules regarding the use of prior inconsistent statements of this sort are codified at OCGA §§ 24-8-801 (d) (1) (A) and 24-6-613 (b).

evidence of Detective Tyner's prior inconsistent statement to Detective Spicer. Trial counsel acknowledged at the motion for new trial hearing that the preliminary hearing transcript was included in discovery, but said that he could not remember why he had not introduced evidence from Detective Spicer; in his habeas affidavit, Detective Spicer noted that he was never interviewed by trial counsel. There is no indication (and the warden does not argue) that Detective Spicer would not have been credible or would have refused to testify if called. See Fisher v. State, 299 Ga. 478, 484 (788 SE2d 757) (2016). It appears that trial counsel simply whiffed on this issue. Although the scope of cross-examination will rarely support a claim of deficient performance, no reasonably competent defense attorney would have decided to forgo presenting this evidence to cast doubt on the credibility of the State and one of its key witnesses and to bolster Cartwright's alibi defense. See Taylor, 299 Ga. at 349.

(b) Whether Cartwright has demonstrated a reasonable probability that trial counsel's failure to introduce Detective Spicer's testimony affected the outcome of the trial is a closer question. The habeas court concluded that Cartwright had not shown Strickland prejudice because he had presented his alibi defense at trial through several other witnesses. That reasoning, however,

16

misses the point for which the defense would have offered Detective Spicer's testimony. The detective's testimony would have been relatively insignificant to bolster the credibility of the five witnesses who testified that Cartwright was at his family's apartment on the night of the shooting — but it was critical to rebut the State's vociferous assertion that Cartwright invented that alibi *after* his post-arrest interview.

The State's claim that Cartwright failed to provide his alibi to Detective Tyner during the post-arrest interview was not a passing comment that the jury might have overlooked; it was instead a targeted attack on the truthfulness of Cartwright's alibi defense — his primary defense at trial. The prosecutor had Detective Tyner testify repeatedly and definitively that Cartwright had not mentioned his alibi in any way during the interview, see footnote 7 above; the prosecutor then relied on that "undisputed evidence" during closing argument to assert repeatedly that Cartwright invented his alibi defense after the interview and then convinced his alibi witnesses to testify on his behalf, see footnote 9 above.

The emphasis that the State placed on its claim that Cartwright belatedly invented his alibi is particularly significant in light of the nature of the evidence

17

against Cartwright. There was no physical evidence linking him to the shooting, and although the State presented four witnesses who said that they saw Cartwright shoot Stafford, the defense substantially impeached each of them. Willis and Ruhl were impeached with their felony drug convictions; two defense witnesses testified that Willis had told them that he shot Stafford; Ruhl admitted that she was close to Willis and that she had used cocaine shortly before the shooting; Brown had felony charges pending against him and waffled in his pre-trial accusation against Cartwright, asserting at one point during his police interview that Willis was the shooter; Brown's sister had reason to support his testimony; and each of the witnesses gave a different account of the events surrounding the shooting. Cartwright offered not one or two but five witnesses in support of his alibi. Indeed, during jury deliberations, the trial court noted that the case was "close" and hinged on witness credibility.[13]

Given the less than overwhelming evidence of Cartwright's guilt, his

---

[13] During the jury's deliberations, the trial court offered to grant Cartwright's motion for a mistrial because the State had failed to notify the defense that the prosecutor had promised to speak on behalf of one of the State's more tangential witnesses during his plea hearing. The court said: "I think this case will be back if it went up [on appeal] because it's so close. So it's just a credibility [contest], the jury keeps wanting to hear people's testimony again, you know, so I'm going to grant the mistrial if that's what [Cartwright's] asking." However, Cartwright chose to waive his claim for a mistrial after the trial court agreed to reopen the evidence so that the State's witness could be questioned about the prosecutor's promise in front of the jury.

affirmative defense of alibi supported by multiple witnesses, and the importance of Detective Tyner's testimony to the State's efforts to disprove that defense, we conclude that trial counsel's failure to introduce Detective Spicer's contrary testimony had a reasonable probability of affecting the outcome of the trial. See, e.g., Bryant v. State, 301 Ga. 617, 621-622 (800 SE2d 537) (2017) (concluding that the appellant showed Strickland prejudice resulting from trial counsel's failure to move to suppress the only physical evidence connecting the appellant to the murder, because the credibility of three eyewitnesses was "substantially challenged," evidence was presented that one of those witnesses was actually the shooter, and the State relied heavily on the illegally obtained evidence in its closing argument); Kennebrew v. State, 299 Ga. 864, 874 (792 SE2d 695) (2016) (concluding that the appellant showed Strickland prejudice when the State focused in its closing argument on evidence trial counsel should have had suppressed, and the other evidence was not overwhelming).

(c) Because Cartwright has demonstrated that his trial counsel provided ineffective assistance, any deficiency in appellate counsel's proving that ineffectiveness-of-trial-counsel claim prejudiced his appeal. See Gramiak, 304 Ga. at 513. The only question remaining is whether appellate counsel performed

19

deficiently by failing to introduce evidence of Detective Spicer's testimony at the motion for new trial hearing to support the ineffectiveness-of-trial-counsel claim.

We see no good reason why a competent appellate lawyer would have failed to raise and support that claim under these circumstances; indeed, Cartwright's appellate counsel did *raise* the claim (along with only two other claims, which were easily rejected). As we held in Cartwright, however, appellate counsel failed to introduce evidence to *support* the claim at the motion for new trial hearing. No reasonable attorney would have failed to present the readily available evidence from Detective Spicer, which was essential to proving trial counsel's ineffectiveness.

Counsel from the Attorney General's office, representing the warden here, do not offer any good reason why this claim should not have been raised and supported. Instead, they argue that this Court erred when we held in Cartwright's prior appeal that he could not show the prejudice required to establish that trial counsel was ineffective because appellate counsel "did not call Detective Spicer to testify at the motion for new trial hearing, nor did he introduce a transcript of the detective's testimony from the preliminary hearing."

20

Cartwright, 291 Ga. at 500. The Attorney General's office now argues that review of the motion for new trial hearing transcript reveals that appellate counsel *did* introduce some evidence to support the ineffectiveness-of-trial-counsel claim and, therefore, appellate counsel did not perform deficiently.[14]

That argument, however, ignores the law of the case doctrine. Under that doctrine, "any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals." OCGA § 9-11-60 (h). "It is well established that the law of the case doctrine applies to holdings by appellate courts in criminal cases," see Hollmon v. State, 305 Ga. 90 (823 SE2d 837) (2019), including in habeas corpus proceedings following a direct appeal, see Roulain v. Martin, 266 Ga. 353, 354 (466 SE2d 837) (1996). Accordingly, our previous conclusion that Cartwright's appellate counsel failed to call Detective Spicer to testify at the motion for new trial hearing or introduce a transcript of

---

[14] Contrary to the argument of the Attorney General's office here, its brief for the State in Cartwright's prior appeal asserted that his appellate counsel "did not call Detective Spicer to testify at the motion for new trial, nor did he introduce a certified copy of the detective's former testimony into the record." (The District Attorney's office made a similar assertion in its brief for the State.) This Court's holding in Cartwright was consistent with that assertion, see 291 Ga. at 500, and the Attorney General did not file a motion for reconsideration disputing the Court's conclusion. Having taken its appellate victory on this ground, the Attorney General's office must continue to take that ground as a given.

21

the detective's testimony from the preliminary hearing was binding on the habeas court and binds this Court as well, regardless of whether that conclusion was correct. See id. See also Buckner v. Barrow, 297 Ga. 68, 69 (772 SE2d 703) (2015).

We therefore conclude that appellate counsel provided ineffective assistance, and the habeas court's ruling to the contrary was erroneous. Accordingly, we reverse the habeas court's denial of Cartwright's petition for a writ of habeas corpus.

Judgment reversed. All the Justices concur.

Decided March 4, 2019.

Habeas corpus. Wilcox Superior Court. Before Judge Fachini.

J. Mark Shelnutt, for appellant.

Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vanessa T. Sassano, Assistant Attorney General, for appellee.