307 Ga. 121
FINAL COPY

S19A0755. THORNTON v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Roderick Thornton was convicted of malice murder and a firearm offense in connection with the shooting death of Jonathan Brady. Appellant contends that the trial court erred by improperly instructing the jury on aggravated assault and by failing to instruct on a witness's motives in testifying and on accomplice corroboration. He also contends that his trial counsel provided ineffective assistance by not objecting to the trial court's failure to give those charges and by eliciting certain testimony during his cross-examination of the lead detective on the case. Each of these claims is meritless, so we affirm.[1]

---

[1] Brady was killed on September 11, 2014. On May 5, 2015, a Fulton County grand jury indicted Appellant for malice murder, two counts of felony murder, aggravated assault, possession of a firearm during the commission of a felony, possession of a firearm by a convicted felon, and use of a firearm by a convicted felon during the commission of a felony. At a trial from October 13 to 16, 2015, the jury found Appellant guilty of all charges. On October 19, the

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. Brady was a drug dealer in the Fulton Industrial Boulevard area of Fulton County, and Appellant was a competing drug dealer in that area. On the night of September 11, 2014, Korey Williams called Brady to buy drugs. They agreed to meet at a gas station on Fulton Industrial Boulevard. Around 10:45 p.m., Brady pulled his white Buick into a

---

trial court sentenced Appellant as a recidivist under OCGA § 17-10-7 (a) and (c) to serve life in prison without the possibility of parole for malice murder, five consecutive years for possession of a firearm during the commission of a felony, five consecutive years for possession of a firearm by a convicted felon, and 15 consecutive years for use of a firearm by a convicted felon during the commission of a felony. The felony murder counts were vacated by operation of law, and the aggravated assault count merged.

Appellant filed a timely motion for new trial, which he later amended twice through new counsel. On November 30, 2015, the trial court amended its sentencing order to correct an error regarding the counts to which the firearm offenses ran consecutively. On December 11, 2018, the trial court held an evidentiary hearing on Appellant's motion for new trial. The next day, the court amended its sentencing order again to sentence Appellant as a recidivist under OCGA § 17-10-7 (a) only and to merge the counts charging possession of a firearm during the commission of a felony and possession of a firearm by a convicted felon into the conviction for use of a firearm by a convicted felon during the commission of a felony. See *Atkinson v. State*, 301 Ga. 518, 521 (801 SE2d 833) (2017). On January 10, 2019, the trial court denied the motion for new trial. Appellant filed a timely notice of appeal, and the case was docketed to the April 2019 term of this Court and submitted for decision on the briefs.

motel parking lot across the street from the gas station. Williams assumed that Brady wanted to meet at the motel instead, and he began to walk toward Brady's car.

As Brady sat in his car outside the motel, his friend Tariq Harris, who had been smoking marijuana nearby, walked up to the car, leaned into the open front driver's-side window, and started talking with Brady. According to Harris, he then heard a loud knock followed by a gunshot, and he jumped back from the car. He heard someone mumble, "I wasn't playing" or "You thought I was playing, b**ch."[2] Harris saw Appellant, whom he had known for many years, standing next to him, close to the rear driver's-side window. Harris also saw another man he knew, Robert Henderson, standing behind the car. Henderson, who had been using drugs nearby and was walking through the motel parking lot, saw his friends Harris and Appellant standing near the car; Henderson then heard the gunshot as he walked behind the car.

---

[2] Harris told the police after the shooting that he heard one of these statements. At trial, he testified that he did not remember saying that to the police, and that he had instead heard someone mumble, "I told you I'll see you."

3

Williams, whose view of Brady's car was partially obstructed by bushes, saw Harris and then Appellant approach the car; he also saw another man standing further away from them. Williams then heard the gunshot. He later told the police that after he heard the sound, he asked what it was, and Appellant said that it was a tire popping, although Williams knew it was not. Williams also said that after the shot, Harris asked Appellant, "What the hell you do that for?" Harris, Henderson, Williams, and Appellant did not call the police. Instead, they walked separately away from the motel.[3]

Almost immediately after the gunshot, which hit Brady under his left arm and then transected his pulmonary artery, he drove his car across Fulton Industrial Boulevard, but he lost consciousness and the car careened into a grassy area across the street from the motel. Emergency responders transported Brady to a hospital, where he soon died from the gunshot wound. The medical examiner determined that the .45-caliber bullet recovered from Brady's body

---

[3] During their police interviews and at trial, Harris, Henderson, and Williams each claimed that they did not see who shot Brady and that they did not see Appellant or anyone else carrying a gun that night.

caused an atypical entrance wound consistent with its having passed through window glass before hitting Brady.

Investigators found a bullet hole in the rear driver's-side window of Brady's car. In the car, they found three bags of crack cocaine, two digital scales, plastic baggies, a 9mm handgun, three cell phones, and $537 in cash. They also found a .45-caliber shell casing in front of the motel. A firearms examiner concluded that the bullet from Brady's body and the shell casing had not been fired by the 9mm handgun found in Brady's car.

The lead detective on the case obtained a video recording of the shooting from one of the motel's surveillance cameras. The recording, which was grainy and had no audio, showed Brady's car pull up near the motel's entrance; moments later, a man in a white t-shirt approached the car and leaned into the front driver's-side window. Another man walked up to the car a few seconds later. He stopped near the first man, closer to the rear driver's-side window. Almost immediately, both men made sudden movements, and the car sped away. The video also showed a third man approaching the

car; that man was standing just behind the car when it left. During his interview with investigators and again at trial, Harris was shown the surveillance video and identified himself as the man in the white t-shirt, Appellant as the second man who approached the car, and Henderson as the man who was standing just behind the car. Henderson made the same identifications when shown the video at trial.[4]

Appellant, who was a convicted felon, was arrested nearly five months after the shooting. He did not testify at trial; his defense theory was that Harris alone had committed the murder. To support that theory, Appellant argued that the surveillance video showed Harris swing his arms out as if to shoot Brady just before the car sped away. The lead detective, however, testified that Appellant was the only person shown on the video who was standing in a position to shoot through the rear driver's-side window. The State argued that Harris, who was standing by the open front driver's-side

---

[4] The prosecutor did not play the surveillance video for Williams, and he was not asked to identify any of the individuals shown in the video.

window before the car sped away, would not have shot Brady through the closed rear window. In addition, the prosecutor asked Harris if he had committed the murder, and he squarely denied it.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant contends that the trial court erred by improperly instructing the jury on aggravated assault and by failing to instruct on a witness's motives in testifying and on accomplice corroboration.

Appellant's trial counsel did not object to the aggravated assault charge or to the omission of the witness's-motives charge, and counsel withdrew his request for an accomplice-corroboration instruction. Thus, as Appellant acknowledges, this Court's review of these claims is for plain error only. See OCGA § 17-8-58 (b); *State v. Kelly*, 290 Ga. 29, 32 (718 SE2d 232) (2011).

> To show plain error, Appellant must demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. "Satisfying all four prongs of this standard is difficult, as it should be."

*Hood v. State*, 303 Ga. 420, 425-426 (811 SE2d 392) (2018) (citations omitted).

(a) Appellant argues that the trial court committed plain error by erroneously instructing the jury on aggravated assault, which allegedly resulted in the jury's improperly finding him guilty of that count and the count of felony murder based on it. We need not decide whether the aggravated assault instruction was flawed, however, because Appellant was not convicted of or sentenced for aggravated

8

assault or felony murder. Thus, this claim is moot. See *Johnson v. State*, 302 Ga. 774, 786 (809 SE2d 769) (2018); *Hickman v. State*, 299 Ga. 267, 272 (787 SE2d 700) (2016).

(b) Appellant also contends that the trial court wholly failed to give a requested pattern jury instruction on a witness's motives in testifying. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.31.80 Immunity or Leniency Granted Witness (instructing that in assessing a witness's credibility, the jury may consider his possible motives in testifying, including any possible pending prosecutions, negotiated pleas, grants of immunity, or leniency). This claim is contradicted by the record, which shows that the trial court *did* give the pattern charge. Accordingly, there was no error, much less plain error.

(c) Appellant asserts that the trial court committed plain error by failing to instruct the jury under OCGA § 24-14-8 that the testimony of an accomplice must be corroborated to establish a fact. Appellant withdrew his request for an accomplice-corroboration instruction during the charge conference, so the trial court did not

give that charge and instead instructed the jury that "[t]he testimony of a single witness, if believed, is sufficient to establish a fact. Generally there is no legal requirement of corroboration of the witness, provided you find the evidence to be sufficient." Because there was no evidence that any witness was an accomplice, Appellant cannot prevail on this claim.

"A jury instruction on the need for accomplice corroboration should be given if there is slight evidence to support the charge. An accomplice is someone who shares a common criminal intent with the actual perpetrator of a crime." *Stripling v. State*, 304 Ga. 131, 136 (816 SE2d 663) (2018) (citation and punctuation omitted). See also OCGA § 16-2-20 (defining parties to a crime). "'(M)ere presence or approval of a criminal act is not sufficient to render one a party to the crime,'" although "'criminal intent . . . may be inferred from [a] person's conduct before, during, and after the commission of the crime.'" *Walter v. State*, 304 Ga. 760, 766 (822 SE2d 266) (2018) (citation omitted). Appellant argues, without pointing to any particular evidence, that there was some evidence that Harris was

his accomplice in committing the crimes. We disagree.

As discussed in Division 1 above, the evidence presented at trial showed that Harris walked up to Brady's car alone and leaned into the front driver's-side window; Appellant then separately approached the rear driver's-side window; after Harris heard a gunshot and saw Appellant standing next to him, he asked Appellant, "What the hell you do that for?"; and the two men then walked separately away from the scene. None of the eyewitnesses to the shooting testified that Appellant and Harris acted together to shoot Brady, and none of the evidence supported an inference that Harris committed the crimes charged with Appellant.

Nor did Appellant make such an argument at trial. Instead, the defense theory was that Harris alone shot Brady. Harris's presence at the scene, sudden movements just before Brady's car sped away, and initial failure to contact the police might amount to slight evidence that *Harris* committed the shooting, but it was not evidence that Harris and Appellant committed the crimes *together*. Rather, the evidence showed (and Appellant argued) that if Harris

shot Brady, Harris would be guilty and Appellant would be completely innocent. Under these circumstances, an accomplice-corroboration instruction was not supported, and the trial court did not err, plainly or otherwise, by not giving that charge. See *Walter*, 304 Ga. at 766-767 (concluding that the trial court's failure to give an accomplice-corroboration charge was not obvious error where there was no evidence that the alleged accomplice shared a common criminal intent with the appellant); *Stripling*, 304 Ga. at 136 (holding that the trial court did not commit obvious error by not giving an accomplice-corroboration charge where there was no evidence that the alleged accomplices committed the crimes with the appellant).

3. Appellant contends that his trial counsel provided ineffective assistance in three ways. To succeed on these claims, Appellant must establish that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, Appellant must prove that

his lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690.

> This is no easy showing, as the law recognizes a "strong presumption" that counsel performed reasonably, and Appellant bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course."

*Brown v. State*, 302 Ga. 454, 457 (807 SE2d 369) (2017) (citations omitted). To establish prejudice, Appellant must prove that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. We need not address both parts of the *Strickland* test if Appellant makes an insufficient showing on one. See id. at 697.

(a) Appellant argues that his trial counsel was ineffective for failing to object when the trial court did not give the requested pattern jury instruction on a witness's motives in testifying. But as we explained in Division 2 (a) above, the trial court did in fact give

13

the pattern charge. Thus, Appellant's trial counsel was not deficient for failing to object on the ground that the charge had been omitted, because that objection would have been meritless. See *Varner v. State*, 306 Ga. __, __ (__ SE2d __) (2019).

(b) Appellant also contends that his trial counsel provided ineffective assistance by withdrawing the request for an accomplice-corroboration instruction. But as we explained in Division 2 (c) above, none of the evidence presented at trial indicated that Harris and Appellant were accomplices in the crimes. Appellant's counsel was not deficient in failing to request a charge that was not authorized by the evidence. See, e.g., *Barnes v. State*, 305 Ga. 18, 21 (823 SE2d 302) (2019).[5]

(c) Appellant argues that his trial counsel provided ineffective assistance by eliciting certain testimony from the lead detective on

---

[5] To support this claim, Appellant relies primarily on *Fisher v. State*, 299 Ga. 478 (788 SE2d 757) (2016), in which we held that trial counsel provided ineffective assistance by failing to request an accomplice-corroboration charge. See id. at 485-489. But *Fisher* is distinguishable, because there was unquestioned evidence in that case to authorize the charge (and because there was no strategic reason not to request it). See id. at 485-486.

the case. On direct examination by the State, the detective testified that based on his repeated review of the surveillance video during his investigation, he believed that Appellant was the only person who could have shot Brady through the rear driver's-side window, and that Harris had not been in a position to make the shot. During cross-examination, Appellant's counsel asked the detective if he was "100% sure" that Appellant was the shooter; whether another person could have made the shot; and whether Harris could have been the shooter. The detective replied that he was 100% sure that Appellant was the shooter; that Appellant was the only person in a position to make the shot; and that he was 100% sure that Harris could not have shot Brady.

Appellant now contends that his trial counsel was ineffective for eliciting this testimony because it went to the "ultimate issue" in the case. In support of this claim, Appellant cites only cases decided under Georgia's old Evidence Code.[6] Under our new Code, which

_____

[6] More than three years ago now, in a case governed by the new Evidence Code in which the parties cited no case law interpreting that Code or the

15

applied to Appellant's 2015 trial, lay opinion testimony is not objectionable simply because it addresses an ultimate issue. See OCGA § 24-7-704 (a) (explaining that, subject to an exception not relevant here, "testimony in the form of an opinion or inference otherwise admissible shall not be objectionable because it embraces an ultimate issue to be decided by the trier of fact"); *Grier v. State*, 305 Ga. 882, 886 (828 SE2d 304) (2019). See also *United States v. Beverley*, 775 Fed. Appx. 468, 474 (11th Cir. 2019); *United States v. Campo*, 840 F3d 1249, 1266-1267 (11th Cir. 2016).[7]

Here, the detective's opinion that Appellant was the only person who had been in a position to shoot Brady was rationally

_____

parallel provisions of the Federal Rules of Evidence, we proclaimed that "Georgia lawyers do this Court no favors . . . when they fail to recognize that we are all living in a new evidence world and are required to analyze and apply the new law. . . . We trust that this shortcoming will not be repeated in future cases coming to this Court." *Davis v. State*, 299 Ga. 180, 192 (787 SE2d 221) (2016). We are disappointed that Appellant's counsel from the Appellate Division of the Georgia Public Defender Council, despite her regular practice before this Court, failed to heed this admonition.

[7] OCGA § 24-7-704 (a) materially tracks its counterpart in the Federal Rules of Evidence; we therefore look to the decisions of the federal appellate courts, particularly the Eleventh Circuit, for guidance in applying this provision. See *Grier*, 305 Ga. at 886.

based on inferences he formed by reviewing the surveillance video and other evidence and by interviewing witnesses, and his testimony about those inferences was helpful to determine who shot Brady. See OCGA § 24-7-701 (a).[8] See also *Grier*, 305 Ga. at 885. Thus, the testimony about which Appellant complains was admissible under OCGA §§ 24-7-701 and 24-7-704, and trial counsel's eliciting this testimony was not deficient in that respect.

Moreover, as the trial court correctly concluded in its order denying Appellant's motion for new trial, his counsel elicited the detective's testimony for a reasonable strategic purpose. Immediately after counsel elicited the testimony described above, he asked whether the detective had initially believed that Harris was the shooter, and the detective acknowledged that when he first

---

[8] OCGA § 24-7-701 (a) says:

> If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences shall be limited to those opinions or inferences which are:
> (1) Rationally based on the perception of the witness;
> (2) Helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and
> (3) Not based on scientific, technical, or other specialized knowledge within the scope of Code Section 24-7-702.

viewed the surveillance video, he thought that Harris had committed the crimes. Counsel then elicited the detective's testimony that he had not been 100% sure that Appellant was the shooter, but that he was now 100% sure, "even though initially [he] thought it was [Harris]." Trial counsel's decision to undermine the detective's testimony on direct examination and attack his credibility in this manner was not unreasonable. See *Morrison v. State*, 303 Ga. 120, 126 (810 SE2d 508) (2018) ("'[D]ecisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel.'" (citation omitted)). For these reasons, Appellant has failed to show that his trial counsel performed deficiently with respect to this claim. See, e.g., *Lupoe v. State*, 284 Ga. 576, 578 (669 SE2d 133) (2008) (concluding that trial counsel's decision not to object to a witness's reading aloud from his statement to the police was strategic, because during cross-examination, counsel used portions of the statement to undermine the witness's testimony).

(d) Finally, Appellant contends that the cumulative effect of his

trial counsel's alleged errors prejudiced the outcome of his trial. But we "'evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors.'" *Cox v. State*, 306 Ga. ___, ___ (832 SE2d 354) (2019) (citation omitted). Because Appellant has failed to show that his counsel performed deficiently with respect to any of his allegations of ineffective assistance, this claim, too, fails. See id.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 21, 2019.
Murder. Fulton Superior Court. Before Judge Dunaway.
*Genevieve Holmes*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Marc A. Mallon, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.