315 Ga. 568
FINAL COPY

S22A1316. RUCKER v. THE STATE.

LaGrua, Justice.

Appellant Anthony Tyrone Rucker, Jr., was convicted of malice murder and other crimes in connection with a January 28, 2014 home invasion and armed robbery in Fulton County, which resulted in the death of Tommy Lee Finch, Jr., and serious injuries to Zaccarie Printup.[1]  On appeal, Rucker contends that the trial court

---

[1] In March 2016, Rucker was indicted by a Fulton County grand jury on charges of participation in criminal street gang activity, malice murder, five counts of felony murder, two counts of armed robbery, two counts of aggravated assault with a deadly weapon, aggravated battery, burglary in the first degree, and two counts of possession of a firearm during the commission of a felony. In September 2017, a jury found Rucker guilty of all counts.  The trial court sentenced Rucker to serve life in prison without the possibility of parole on the malice murder count and concurrent life sentences without the possibility of parole for each armed robbery count, plus an additional 45 years on the aggravated battery, burglary, participation in criminal street gang activity, and possession of a firearm counts.  The felony murder counts were vacated by operation of law. On October 2, 2017, Rucker filed a timely motion for new trial, which he amended through new counsel on April 22, 2019.  Following an evidentiary hearing, the trial court denied Rucker's motion for new trial on May 6, 2022.  Rucker filed a timely notice of appeal to this Court on June 1, 2022, and the case was docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

erred in failing to instruct the jury on accomplice corroboration and in denying Rucker's motion to dismiss the case on constitutional speedy trial grounds. For the reasons that follow, we affirm Rucker's convictions.

The evidence presented at Rucker's trial showed that, on the evening of January 28, 2014, Finch and his wife, Patricia Finch, were at their home in Southwest Atlanta. Patricia was known around the neighborhood as the "Candy Lady" because she sold candy and soda out of her house to neighborhood children, as well as "loose cigarettes" to "older customers." Patricia testified that she generally operated her candy business from 8:00 a.m. to 9:00 p.m. each day, but that business had been slow on January 28 because it was snowing "pretty heavy" and "getting a little slippery." Around 7:00 p.m., a customer came to the Finches' house whom Patricia did not recognize. This young man — whom Patricia identified at trial as Rucker — was short, with his hair styled in "little twists" or a "little [A]fro," and was wearing a red and blue jacket and "sweating real bad" down his face to his neck. Patricia testified that she

2

"couldn't understand why he was sweating like that" because he had just come from outside where it was snowing. She asked Rucker why he was sweating, but he did not respond. Rucker was accompanied by an unidentified young man who stayed at the top of the Finches' driveway and did not come inside the house.

According to Patricia, Rucker told her that he wanted to buy "[a] Snicker[s] bar and a cigarette." Patricia kept the candy on a candy stand right outside her bedroom door and the cigarettes and soda "[r]ight by" her bed. As Patricia led Rucker to her bedroom, she observed Rucker "looking all around." She testified that he "was looking in [her] bedroom. He was looking at everything. He was looking in the kitchen. He was — he was just strange. He was just — it just didn't seem right. I never had a child come in and do that." Patricia let Rucker select candy from the candy stand, and she sat on the edge of her bed and asked him "what he was doing out here in the cold like that." Rucker told her that he wanted to buy a cigarette, so Patricia handed him one. Rucker then paid for the items and left the house. Patricia was worried after that because

3

Rucker had been "sweating so bad" and "his demeanor, the way he was acting" was "odd."

Printup, the Finches' adult son, Mia Stewart, Printup's fiancée, and their young daughter also lived at the Finches' house. Printup owned a disc jockey (D.J.) service and was supposed to D.J. for a party on the night of January 28, but the party was cancelled because of the snow. Printup had already set up for the party earlier in the evening, and he returned home around 8:30 or 9:00 p.m. after breaking everything down. When Printup returned, he unloaded his equipment — two speakers and a 32-inch television — into the bedroom he shared with Mia and their daughter, and then he played video games for the rest of the evening on a PlayStation connected to a wall-mounted television in his bedroom.

Around 10:30 p.m., Mia put their daughter to sleep in her bed, and Mia also got into bed and went to sleep. About 30 minutes later, Printup — who was still awake playing video games — heard "heavy footsteps walking up the ramp" to the front porch of the house. According to Printup, he "could tell there w[ere] two people, because

the first footsteps came up first, and then the second one followed it." Printup heard a knock at the door, and since everyone else in the house was in bed, he went to answer the door.[2] Printup asked who it was and what they wanted, and the people at the door responded, "cigarettes and a drink." Printup then opened the door.

According to Printup, "[b]y the time [he] could get the door halfway open, a gunshot bullet flew across [his] face. [He] couldn't even get the door opened up quick enough." Printup testified that he tried to close the door, but "it slammed on the gun." Two men — both armed with handguns — then "pushed the door in and just started shooting."[3] Printup testified that the men told him, "[Y]ou're going to die today," and one of them "shot [Printup] again in the back." Printup also felt a "sting" on his left side. One of the men was around his size — 5'9″ or 5'10″ — and the other was shorter than

---

[2] Printup testified that the late hour of this visit did not alarm him because he "never thought something would happen to a Candy Lady." He just assumed if someone was coming to see the Candy Lady, "it was some honest person coming to the door."

[3] Law enforcement located a .32-caliber shell casing in the Finches' living room and a .45-caliber shell casing in the doorway of the Finches' bedroom. There were also two "indentions" in the wall of the living room caused by gunshots.

him.  Printup started tussling with the shorter of the two men, and then the shorter man broke free and ran toward the Finches' bedroom.  Printup managed to crawl out of the front door into the snow and laid his head on the concrete to get "elevation to [his] neck" because he "was losing breath."

Patricia testified that, around 11:00 p.m., she woke up to gunshots, "a lot of shots."  She testified that the Finches did not keep firearms in the house because she is "scared of guns."  Patricia could hear Printup asking for help, and then a "young man c[a]me in [her] room" and stood near the doorway.  Patricia said the young man — whom she identified at trial as Rucker — was the same man from earlier in the evening and was wearing the same red and blue jacket. Rucker was also wearing a mask, but he had it pulled up, exposing most of his face and his eyes.  Patricia testified that she was "so upset that he could come back and do this to me."

According to Patricia, Rucker pointed a gold and black handgun at her.  Finch jumped out of bed, and when he did, Rucker shot him.  Patricia was "screaming, saying please don't kill him."

Rucker directed Finch to lie on the floor, and Finch begged Rucker not to kill his wife. Patricia continued screaming, and she "could see where [Rucker] had shot [Finch] on his stomach," and there was "[a] lot of blood" and "[a] big hole." Patricia begged Rucker not to kill them, and Rucker told her to "shut up" and "lie down on the floor." Patricia testified that, when she heard Rucker's voice, she knew it was the young man from "earlier in the day" — the one who "had on the red-and-blue jacket." Rucker then reached into the television stand in the Finches' bedroom and "grabbed the Snickers bars, he snatched the cable box, and the T.V. off the stand." Rucker left the room, and Patricia could hear Mia screaming. Rucker came back into the Finches' bedroom and told Patricia to give him their cell phones. Patricia gave Rucker two cell phones. Patricia testified that another young man was with Rucker that night, and she heard him tell Rucker, "[L]et's go, let's go."

Mia testified that she woke up to gunshots around 11:00 p.m., and when she heard "the commotion" outside of her bedroom, she immediately closed and locked the bedroom door, told her daughter

7

to "stay quiet," covered her daughter's head with a blanket, and crouched behind the bedroom door on the floor. While Mia was crouched on the floor, someone kicked in the door, and a young man — whom Mia identified at trial as Rucker — entered the room, wearing a red and blue jacket and a mask pulled up above his eyes. Mia testified that Rucker pointed a gold handgun at her head and asked her, "what works," referring to the electronics in the bedroom. Mia did not respond, and Rucker tried to grab the television off the wall, but could not "get it down." He also tried to grab Printup's speakers, but could not "pick that up," so "he ended up taking the TV" — the 32-inch television Printup used for his D.J. services. Rucker also took the cell phone out of Mia's hand — a black Samsung phone with a pink case — and left. Mia remained in the bedroom for about 15 or 20 minutes to make sure Rucker was gone. Mia then ran outside of the house, screaming, and she saw Printup "bleeding in the snow." Mia ran inside to grab a pillow and blanket for Printup, and she covered him while she ran next door for help.[4]

_____

[4] Patrick Pinson, the Finches' next door neighbor, testified that he "was

8

According to Patricia, she and Finch also stayed in their bedroom for about 15 minutes after the shootings to make sure the intruders were gone, and then, they jumped up and ran into the living room, looking for Printup. Patricia testified that, even though Finch was "bleeding so bad," he still "ran to the door screaming where is his child." The Finches found Printup in the front yard, and Finch and his uncle — who also lived with the Finches — picked up Printup and carried him into the living room. Patricia testified that the only phone they had access to was Finch's uncle's phone — since the others had been stolen — and they called 911.

Fire rescue arrived about 30 minutes later — close to midnight — because the roads were difficult to traverse due to snow. The police and emergency personnel eventually arrived, as well, and Finch and Printup were transported to the hospital. Printup sustained gunshot wounds to his back and left side and remained in

---

awakened by Mia bamming at the door" around 11:00 p.m. Pinson stated that, when he opened the door, Mia was "[f]rantic, scared, [and] crying" and "[c]ouldn't get her words together." Pinson got dressed and went to the Finches' house with Mia to assist her.

the hospital for approximately two weeks, where he "had to learn how to walk again." Finch, who was placed in a medically-induced coma shortly after his admission, sustained a gunshot wound to the abdomen and underwent numerous operations over the next few months. On May 10, 2014, Finch died from complications from the gunshot wound, including sepsis and respiratory distress.

On February 5, 2014, Detective Paul Vignola with the Atlanta Police Department interviewed Patricia, Mia, and Printup at the hospital. Detective Vignola showed Patricia a photographic lineup of several juveniles, including one potential person of interest, based on the limited descriptions of the shooter the police had been given; however, Patricia was unable to identify anyone. At that time, Mia told Detective Vignola that she believed her cell phone was still active and being used after it was stolen.[5] Detective Vignola then secured a court order for Mia's phone number to search for activity on the phone on or after January 28, 2014. Before Detective Vignola

---

[5] Printup testified that he tried calling Mia's phone number while he was in the hospital, and an unidentified woman answered the call.

was able to review the corresponding call logs, Finch passed away, and the case was reassigned to Atlanta Police Detective Cedric Smith in the homicide unit.

Detective Smith testified that, after he took over the investigation, he was able to review Mia's cell phone records from January 28 to February 9, 2014, and he linked one of the phone numbers to Tamecia James. James — who dated Rucker for a few months in 2011 — testified that, a day or two after the January 28 incident, she asked Rucker if he had a cell phone she could use and "switch [her] service to" because her old phone had a cracked screen. Rucker told James he would "meet [her] with a phone soon." On February 6, 2014, James met Rucker at the Westlake MARTA station to pick up the new cell phone. According to James, the cell phone — a black Samsung phone with a pink case — had a picture of a girl on the screen whom James did not recognize. After obtaining the phone from Rucker, James tried to call her existing cell phone number from the new phone. James's old phone started ringing, and at that point, she "realized that the [new] phone was

11

still on." James testified that she was "trying to figure out" why Rucker would "give [her] a phone with the service still on it," so she contacted Rucker to tell him that the phone was "still on." Rucker told her not to use it until it "got turned off."

According to James, about a week after she advised Rucker that the new cell phone still had service, she received a call from a detective on the new phone. James testified that, as soon as the detective identified himself, she hung up on him. Then, in late May 2014, another detective — Detective Smith — contacted James "on her old cell phone" and asked her how she got the other phone — i.e., the cell phone Rucker had given her. James told Detective Smith that "Uno" — Rucker's nickname — had given her the phone, and Detective Smith advised her that her old cell phone number had shown up on the call log for that phone. After the phone call with Detective Smith, James contacted Rucker, who told her to "throw the phone away." James testified that this raised suspicions for her that "he probably did something to get the phone," so she "got rid" of the phone.

Based upon Detective Smith's conversation with James and the corresponding phone records, he was able to determine that James received Mia's cell phone from Rucker. Detective Smith searched through social media, looking for people with the nickname "Uno." Detective Smith located two men with this nickname — Rucker and another man named Anthony Repress. Detective Smith then prepared two photographic lineups — each containing photographs of Rucker, Repress, and four other men — with a different photograph of Rucker and of Repress in each lineup.

On June 2, 2014, Detective Smith went to the Finches' house to show Patricia and Mia the photographic lineups. Detective Smith separated the two women, with Patricia in the living room and Mia in the kitchen, and showed them the lineups. According to Detective Smith, Patricia was able to identify Rucker in "[s]econds." She held the photograph and "became very emotional." Detective Smith testified that Patricia looked through all of the photographs and "she said this is the person that came into the house" — identifying Rucker's photograph. Patricia testified that, as soon as Detective

Smith flipped over Rucker's picture, she "knew he was the one who shot [her] husband." Patricia identified Rucker again at trial, stating she knew he shot her husband and son on January 28, 2014, because she saw "the young man's face," "his mouth," and "his teeth." Patricia said, "[She] was sure. [She] was positive."

After Detective Smith showed the photographic lineup to Patricia, she left the living room and went into her bedroom. Detective Smith then showed the other photographic lineup to Mia. Mia also quickly identified Rucker, pointing "to him with her finger." Mia testified that, when she viewed the photographic lineup, she was able to identify Rucker "immediately," stating, "[T]hat's him. I know a hundred percent that's him." Mia also identified Rucker at trial as the man she identified in the photograph, who "put a gun to her head."

When the police later secured Rucker's cell phone, they obtained a search warrant to "dump the contents of the phone" and discovered personal photographs from Patricia's and Mia's stolen cell phones in Rucker's phone contents, which — according to the

14

police — likely occurred when Rucker downloaded material from the stolen phones onto a common device. Additionally, the police discovered photographs, text messages, and social media postings on Rucker's cell phone indicating that Rucker was likely affiliated with the "Sex Money Murder" set of the East Coast Bloods gang. Detective Mark Belknap, an Atlanta Police Department detective with the Criminal Intelligence Unit — a sub-unit of the Gang Unit — testified as an expert at trial and stated that he believed Rucker was a member of the "Sex Money Murder" gang based on Rucker's tattoos; photographs on his cell phone and social media accounts depicting hand signals, gang apparel, marked money, and handguns; and text messages between Rucker and other contacts with "gang identifiers." Several of those text messages referenced Rucker's involvement in the home invasion and shootings at the Finches' home on January 28, 2014. Detective Belknap also talked to several gang members who knew Rucker and confirmed he was affiliated with the gang. Rucker was ultimately arrested for these crimes on November 6, 2015.

1. On appeal, Rucker contends that the trial court erred in failing to instruct the jury on accomplice corroboration because James was an accomplice to the crimes. See OCGA § 24-14-8.[6] The trial court did not charge the jury on corroborating an accomplice's testimony, but instead, instructed the jury: "The testimony of a single witness, if believed, is sufficient to establish a fact. Generally, there is no legal requirement for corroboration of a witness provided you find the evidence to be sufficient." However, Rucker did not request an accomplice corroboration instruction or object to the trial court's failure to give this instruction after the jury was charged. "[T]hus any appellate review of the trial court's instructions is for plain error only." *Palencia v. State*, 313 Ga. 625, 627 (872 SE2d 681) (2022).

To establish plain error in regard to jury instructions, Rucker

_____

[6] OCGA § 24-14-8 provides:

The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

must satisfy the following four prongs:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Palencia*, 313 Ga. at 627 (quoting *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011)). "Satisfying all four prongs of this standard is difficult, as it should be." *Kelly*, 290 Ga. at 33 (2) (a) (citation and punctuation omitted).

Rucker asserts that the trial court's failure to instruct the jury on accomplice corroboration was obvious error because the following evidence demonstrated that James was an accomplice to the crime: (1) James was Rucker's former girlfriend; (2) she asked him to procure her a cell phone; (3) she accepted a cell phone from Rucker

17

that she suspected had been stolen; (4) she avoided phone calls from the police and then advised Rucker that the police had attempted to contact her; (5) she threw the cell phone away when Rucker told her to do so; and (6) she referred to Rucker by his purported gang nickname, "Uno." Rucker contends that this evidence of James's close association with him, in addition to her actions to help conceal the crime after it occurred, are sufficient to establish her as a party to the crime and show her connection to it. And, Rucker further argues that, because he was directly linked to the crime through the testimony of James, the trial court erred in failing to instruct the jury on accomplice corroboration.

"A jury instruction on the need for accomplice corroboration should be given if there is slight evidence to support the charge." *Thornton v. State*, 307 Ga. 121, 125 (2) (c) (834 SE2d 814) (2019) (citation and punctuation omitted). "An accomplice is someone who shares a common criminal intent with the actual perpetrator of a crime." Id. (citation and punctuation omitted). Assuming for the sake of argument that "slight evidence," id., was presented of

18

accomplice corroboration such that the trial court clearly erred in not giving this charge — thereby satisfying the second prong of the plain error test — we conclude that Rucker has not met the third prong of the plain error test, "as he fail[ed] to establish that omitting the instruction probably affected the outcome of his trial." *Lyman v. State*, 301 Ga. 312, 318 (2) (800 SE2d 333) (2017). See also *Kelly*, 290 Ga. at 34 (2) (b) (holding that "the omission of the instruction did not affect the outcome of the proceedings"). The evidence presented by the State in this case was substantial and included two eyewitness identifications of Rucker as the perpetrator, as well as incriminating text messages from Rucker's cell phone to his gang-affiliated contacts, acknowledging that he participated in the January 28, 2014 home invasion and shootings.

In light of the other evidence presented against Rucker at trial, Rucker "has not met his burden of affirmatively showing that the failure to give an accomplice corroboration instruction probably affected the outcome of his trial." *Lyman*, 301 Ga. at 320-321 (2). Accordingly, even if there was clear and obvious error, "there is no

likelihood that the outcome of the trial would have been different had the instruction in question been given, and, for this reason . . . , there is no plain error." *Kelly*, 290 Ga. at 34 (2) (b).

2. Rucker also contends that the trial court erred in denying his motion to dismiss the case on constitutional speedy trial grounds, which was filed on April 13, 2017. After a hearing, the trial court determined that Rucker's constitutional speedy-trial right was not violated and denied his motion to dismiss on June 28, 2017. In denying the motion, the trial court concluded that 19 months elapsed between the date of Rucker's arrest and the issuance of the order, which met the threshold to require application of the four-factor balancing test set forth in *Barker v. Wingo*, 407 U. S. 514 (92 SCt 2182, 33 LE2d 101) (1972). See also *Doggett v. United States*, 505 U. S. 647, 651 (112 SCt 2686, 120 LE2d 520) (1992). And, after reviewing and considering each of the *Barker-Doggett* factors, the trial court concluded that the State had not violated Rucker's right to a speedy trial. The case then proceeded to trial on September 18, 2017. We see no clear error in the trial court's factual findings nor

20

any abuse of discretion in the trial court's weighing of the *Barker-Doggett* factors and its conclusion that Rucker's constitutional right to a speedy trial was not violated here.

> Courts examining an alleged denial of the constitutional right to a speedy trial first must consider whether the interval between the defendant's arrest, indictment, or other formal accusation and the trial is sufficiently long so as to be characterized as presumptively prejudicial. If the delay is long enough to invoke the presumption of prejudice, the trial court must balance four factors: (1) whether the delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for the delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as the delay's result. In this context, we must accept the factual findings of the trial court unless they are clearly erroneous. Moreover, the trial court's weighing of each factor and its balancing of all four factors — its ultimate judgment — are reviewed on appeal only for abuse of discretion. As we have discussed, speedy-trial claims require trial courts to engage in a difficult and sensitive balancing process. This task is committed principally to the discretion of the trial court, and this Court has a limited role in reviewing the trial court's decision.

*Williams v. State,* 314 Ga. 671, 677-678 (4) (878 SE2d 553) (2022) (citations and punctuation omitted).

In this case, the trial court determined that the length of the delay between the date of Rucker's November 2015 arrest and the June 2017 motion to dismiss hearing was 19 months, and thus, it met the one-year threshold to be deemed "presumptively prejudicial." *Doggett*, 505 U. S. at 650. Although both parties concede that the trial court "properly determined that the delay was presumptively prejudicial," *Williams*, 314 Ga. at 678 (4), Rucker challenges the date on which the trial court started calculating the delay, as well as the trial court's weighing of the four factors under *Barker-Doggett* and the corresponding conclusions.

(a) *Length of the delay*.

The trial court concluded that the 19-month delay — "to the extent that it constitute[d] more than the customary period for investigation and discovery" — weighed against the State, but that "the mere passage of time" was "not enough, without more, to constitute a denial of due process." Neither party contests that the trial court properly weighed the length of the delay against the

22

State. However, as noted above, Rucker disputes the trial court's calculation as to the length of the delay.

At the hearing on Rucker's motion to dismiss, trial counsel stated in her place that Rucker was interviewed by an Atlanta Police Department detective about the crimes in June 2014, but counsel did not specify the exact date or location where this interview occurred or provide any substantive detail as to what was discussed during the interview.[7] Rucker asserts that the trial court should have calculated the length of the delay from the date of Rucker's police interview, as opposed to Rucker's November 2015 arrest date, and argues that this period of delay was "uncommonly long." Rucker also argues that, because he was already being held on other charges when police interviewed him, his incarceration likely attributed to the delay in seeking a warrant for his arrest on these charges, which "exacerbate[d], rather than mitigate[d], the harms of pretrial detention."

---

[7] The only information about the location of this interview was that it occurred during Rucker's incarceration in DeKalb County on unrelated charges.

23

The trial court found no merit to this argument given that Rucker was not arrested for these charges after the June 2014 interview, but was irrefutably arrested on November 6, 2015 — "the benchmark for the *Barker-Doggett* analysis." We conclude that the trial court did not err by starting its length-of-delay calculation on the date of Rucker's arrest — which, as discussed above, still resulted in a delay that exceeded the one-year threshold for presumptive prejudice. See *Cash v. State*, 307 Ga. 510, 515 (2) (b) (i) (837 SE2d 280) (2019). And "we see no abuse of discretion in the trial court's conclusion that the length of the delay" weighed primarily against the State. See id. at 516 (2) (b) (i).

(b) *Reasons for the delay*.

In considering the reasons for the delay, the trial court focused on two phases of the case — the pre-indictment period between Rucker's November 6, 2015 arrest and the March 18, 2016 indictment, and the post-indictment period between the indictment and the June 13, 2017 hearing on Rucker's motion to dismiss. The trial court concluded that the four-month pre-indictment delay

weighed neutrally or — at worst — benignly against the State, noting that there was "no allegation or evidence that the State deliberately delayed this indictment" to "hamper [Rucker's] defense," see *Barker*, 407 U. S. at 531, and that cases involving criminal gang charges are complex to prepare and present. The trial court further observed that, for more complex charges, investigative delay by the State is acceptable, and the trial court concluded that, to the extent there was any delay attributable to the State's preparation of its case in the pre-indictment stage, it was at most negligent and weighed "as a relatively benign factor against the State."

As for the post-indictment delay, the trial court determined that the case was not "neglected since indictment" and "proceeded with ordinary promptness" and that any delay was the "inevitable delay owing to the human aspects of the practice of law." The trial court noted that Rucker had not alleged that "the State deliberately delayed the case in order to obtain a tactical advantage over Rucker" and concluded that "the reasons for the post-indictment delay [were]

neutral, weighing neither against the State nor [Rucker,] because this case ha[d] been prosecuted with that orderly expedition consistent with due process of law."

Rucker argues that the trial court erred in finding that the delay was neutral or benign because, while it may be generally true that gang cases are "uncommonly complex" and "require significant resources to investigate," such circumstances "did not appear to be true in this case." Rucker asserts that with two eyewitness identifications and statements from Rucker's former girlfriend that he had given her a stolen cell phone, there was "likely probable cause to issue an arrest warrant when the detective first spoke to [Rucker] in June 2014 and the delay from that point is fairly hard to explain." Rucker thus contends that the trial court should have weighed this factor against the State as neglect and abused its discretion in weighing this factor neutrally.

We have already rejected Rucker's argument that the time for calculating the length of the delay should have run from the date of Rucker's police interview in June 2014. And, even if the State was

26

negligent in bringing the case to trial once Rucker was arrested, "[a] more neutral reason such as negligence . . . should be weighted less heavily" against the State. *Barker*, 407 U.S. at 531. We see no abuse of discretion in the trial court's conclusion that the reason for the delay weighed neutrally or benignly against the State. See *Cash*, 307 Ga. at 517 (2) (b) (ii).

(c)   *Assertion of the right.*

The trial court weighed Rucker's delay in asserting his right to a speedy trial heavily against him. Rucker argues that the trial court erred in this regard because, although he did not assert his right to a speedy trial until he filed his motion to dismiss the indictment on April 13, 2017, he was not served with initial discovery until March 2016 or witness transcripts until July 2016 and "the time before a defendant has had the chance to view the evidence should not weigh heavily against him."

> The accused is not required to demand a speedy trial at the first available opportunity, for the Supreme Court has expressly rejected the demand-waiver approach to the constitutional speedy trial right. Even so, a defendant who fails to assert the right at any point in the trial court

27

will have an extremely difficult time establishing a violation of his or her constitutional right to a speedy trial. In order to invoke the right, the accused need not file a formal motion, though that is certainly sufficient. Moreover, invocation of the speedy trial right need not await indictment, information, or other formal charge; the accused can begin demanding that the right to a speedy trial be honored as soon as he or she is arrested. The relevant question for purposes of the third *Barker-Doggett* factor is whether the accused has asserted the right to a speedy trial in due course. This requires a close examination of the procedural history of the case with particular attention to the timing, form, and vigor of the accused's demands to be tried immediately.

*Ruffin v. State*, 284 Ga. 52, 62-63 (2) (b) (iii) (663 SE2d 189) (2008) (citations and punctuation omitted).

In denying Rucker's motion to dismiss, the trial court noted that Rucker waited 17 months to file his constitutional speedy trial motion, that he did not demand a statutory speedy trial or request special permission to file an out-of-time statutory speedy trial demand, and that he was represented by counsel "every step of the way." After weighing the "eve-of-trial assertion of the demand for dismissal (versus a demand for trial), the absence of mitigation, and the fact that Rucker did not demand a statutory speedy trial," the

28

trial court concluded that this factor should weigh heavily against Rucker.

We cannot say that the trial court erred in reaching this determination. Because delay often works to a defendant's advantage, "the accused bears some responsibility to invoke the speedy trial right and put the government on notice that he . . . would prefer to be tried as soon as possible." *Ruffin*, 284 Ga. at 62 (2) (b) (iii). And, "[o]ur cases hold that an extended delay in asserting the right to a speedy trial should normally be weighed *heavily* against the defendant." *State v. Porter*, 288 Ga. 524, 529 (2) (c) (3) (705 SE2d 636) (2011) (emphasis in original). Here, Rucker waited over a year after he was indicted to assert his right to a constitutional speedy trial, and he never filed a statutory speedy trial demand, even though he was represented by counsel throughout these proceedings. See *Sosniak v. State*, 292 Ga. 35, 42 (3) (734 SE2d 362) (2012) (holding that the trial court did not err in finding an eve-of-trial demand for dismissal untimely and properly weighed this factor heavily against the defendant). See also

29

*Higgenbottom v. State*, 290 Ga. 198, 202 (1) (C) (719 SE2d 482) (2011) (holding that the defendant's failure to file his constitutional speedy trial motion to dismiss "until over two years following his arrest" and his failure to "avail himself of his statutory right to a speedy trial" supported the trial court's determination to weigh this factor against the defendant). Accordingly, we conclude that the trial court acted within its discretion in weighing this factor heavily against Rucker.

(d)    *Prejudice.*

Finally, the trial court concluded that, although Rucker was entitled to the presumption of prejudice that arises from a 19-month delay since arrest, the presumption was overcome in this case. In reaching this conclusion, the trial court noted that Rucker "failed to allege actual prejudice in his motion" and further noted that his only assertion of prejudice — beyond the mere passage of time — was raised at the motion to dismiss hearing, when trial counsel stated in her place that one of the State's witnesses listed in discovery had difficulty recalling the statement she gave to police around the time

30

of the incident. The trial court determined that this assertion did "not amount to much" since the witness's statement would have been available to refresh the witness's recollection or impeach her testimony at trial. Thus, the trial court weighed this factor only benignly against the State. However, the trial court ultimately concluded that, based on "the absence of demonstrable prejudice" and Rucker's "own delay in asserting the right," this factor did not weigh in Rucker's favor.

Rucker asserts that the trial court abused its discretion in reaching this conclusion because the length of the delay was presumptively prejudicial. "But the prejudice prong may be weighed against the defendant even in cases of excessive delay." *Cash*, 307 Ga. at 518 (2) (b) (iv). Here, the trial court acknowledged "the presumption of prejudice created by the length of the delay," id., but determined that Rucker did not demonstrate actual prejudice and contributed to the delay in waiting to assert the right. "[I]n attempting to establish that his right to speedy trial was violated, [Rucker] cannot rely solely on the presumptive prejudice from the

31

[19]-month delay." *Williams*, 314 Ga. at 680 (4) (d). Thus, we conclude that the trial court did not abuse its discretion by failing to weigh this factor in Rucker's favor.

"In sum, we see no abuse of discretion in the trial court's weighing of the [*Barker-Doggett*] factors or clear error in the factual findings that supported those determinations." *Cash*, 307 Ga. at 520 (2) (b) (iv). And we see no abuse of discretion in the trial court's conclusion that the 19-month delay in trying Rucker did not violate Rucker's constitutional right to a speedy trial.

*Judgment affirmed. All the Justices concur.*

Decided February 7, 2023

Murder. Fulton Superior Court. Before Judge Newkirk.

*Ross & Pines, Noah H. Pines, Andrew S. Fleischman*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Charles A. Jones, Jr., Karen S. Bemis, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.